JUDGE KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 7688

-------------------------------------------------------------------x

SL SHIPPING PTE LTD,

                            Plaintiff,         09 CV 7688 (LAK)

-v-

                                    **VERIFIED COMPLAINT**

SILVERSHIPS LTD and
OMNI MARINE SERVICE LIMITED,

                        Defendants.

RECEIVED
SEP - 3 2009
U.S.D.C. S.D.N.Y.
CASHIERS

-------------------------------------------------------------------x

Plaintiff, SL SHIPPING PTE LTD (hereinafter "SL SHIPPING"), by its attorneys, CHALOS & CO, P.C., as and for its Verified Complaint against Defendants, SILVERSHIPS LTD (hereinafter "SILVERSHIPS") and OMNI MARINE SERVICES LIMITED (hereinafter "OMNI"), alleges upon information and belief as follows:

<u>JURISDICTION</u>

1.    The Court has subject matter jurisdiction by virtue that the underlying claim herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. § 1333.

<u>THE PARTIES</u>

2.    At all times material hereto, Plaintiff, SL SHIPPING, was and still is a foreign business entity duly organized and existing pursuant to the laws of Singapore, with a principal place of business at 3 Rivervale Link, #06-26 The Rivervale, Singapore 545119.

3.    At all times material hereto, Defendant, SILVERSHIPS, was and still is a foreign business entity duly organized and existing pursuant to the laws of Hong Kong.

4.     At all times material hereto, Defendant, OMNI, was and still is a foreign business entity.

FACTS AND CLAIM

5.     On August 13, 2009, SL SHIPPING, as disponent owner of the vessel M.V. TAY SON 3 (hereinafter "the Vessel"), and SILVERSHIPS, as charterers, entered into a time charter party agreement. *A copy of the fixture recap and form charter party are annexed hereto as Exhibit 1.*

5.     This time charter party agreement is a maritime contract.

6.     Pursuant to the terms and conditions agreed between the parties in the charter party agreement, SILVERSHIPS agreed to, among other things, pay SL SHIPPING a daily hire rate of USD $5,400.00, payable fifteen (15) days in advance.

7.     In breach of the terms of the charter party, Defendant has failed to remit payment for the full amount of hire due and owing.  Defendant SILVERSHIPS has an outstanding balance of USD $312,736.20 which is due to the Plaintiff, SL SHIPPING.

8.     SL SHIPPING sent a Statement of Account to Defendant SILVERSHIPS listing the amount of hire due and payable, and requested payment pursuant to the charter party, in the outstanding sum of USD $312,736.20.  Defendant, SILVERSHIPS, failed to comply with its obligation to pay hire according to the terms of the charter party agreement.  Specifically, Defendant has outstanding hire, a total amount due and owing to Plaintiff, SL SHIPPING, of USD $312,736.20. *See Statement of Account, annexed hereto as Exhibit 2.*

9.     Despite repeated demands for payment, and Defendant's promises to pay hire in a timely manner, Defendant SILVERSHIPS, in breach of the terms of the charter party agreement,

has failed, neglected, and/or otherwise refused to pay Plaintiff for the full amount of said sums due and owing.

10.    Pursuant to the terms of the charter party agreement, all disputes arising there under are to be submitted to London arbitration, with English law to apply.

11.    This action is brought in order to obtain security for Plaintiff's claims and in aid of London arbitration proceedings.

12.    English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

13.    As best as can now be estimated, the Plaintiff, SL SHIPPING expects to recover the following amounts in London Arbitration from Defendant SILVERSHIPS:

| | | |
|---|---|---|
| A. | Principal claim of Unpaid Hire: | *$312,736.20* |
| B. | Estimated interest on Principal claim:<br>3 years at 7.5%, compounded quarterly | *$78,095.35* |
| C. | Estimated attorneys' fees: | *$ 100,000.00* |
| D. | Estimated arbitration costs/expenses: | *$ 50,000.00* |
| | **Total Claim** | **$ 540,831.55** |

14.    Therefore, SL SHIPPING's total claim for breach of the maritime contract against SILVERSHIPS is in the aggregate USD $540,831.55.

15.    Defendant OMNI is a receiving/paying agent of Defendant SILVERSHIPS, such that OMNI, is now, or will soon be, holding assets belonging to SILVERSHIPS, or vice versa.

16.    Defendant SILVERSHIPS sub-chartered the Vessel to a third party, and entered an agreement with the third party that freight would be payable to Defendant OMNI. *See Addendum attached hereto as Exhibit 3.*

17.    It is not general practice in the maritime community, nor anywhere else, for independent companies to make or receive large payments on behalf of other independent companies.

18.    Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

19.    Upon information and belief, at all material times, there existed such unity of ownership and interest between Defendants SILVERSHIPS and OMNI, such that no separation exists between them; and the corporate form of Defendant SILVERSHIPS has been disregarded such that Defendant OMNI primarily transacted the business of Defendant SILVERSHIPS, or vice versa.

20.    At all material times, Defendant OMNI, has disregarded the corporate form of Defendant SILVERSHIPS to the extent that Defendant OMNI was actually carrying on SILVERSHIPS' business and operations as the same were their own, or vice versa.

21.    Based on the foregoing investigation, there are reasonable grounds to conclude that the Defendant OMNI is the alter-ego of Defendant SILVERSHIPS, and, therefore, Plaintiff SL SHIPPING has a valid prima facie *in personam* claim against Defendant OMNI based upon alter ego liability.

## BASIS FOR ATTACHMENT

22.    Defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendants is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers,

goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendants within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

23.    Defendants are continuously engaged in international shipping and conducts business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  Dollars are the *lingua franca* of international commerce.

24.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers

25.    Plaintiff believes that some of these assets, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendants and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including, but not limited to, ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank, Wells Fargo Bank, CHIPS and possibly other banks or financial institutions located in New York.

WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.     That since the Defendants cannot be found within the District, as set forth in the Declaration of George M. Chalos, , as set forth in the Declaration of George M. Chalos (*attached hereto as Exhibit 4*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendants' tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendants, up to the amount of USD $540,831.55 to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.     That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
       September 3, 2009

                                   CHALOS & CO, P.C.
                                   Attorneys for Plaintiff
                                   SL SHIPPING PTE LTD


             By:    _____
                                   George M. Chalos (GC-8693)
                                   123 South Street
                                   Oyster Bay, New York 11771
                                   Tel: (516) 714-4300
                                   Fax: (516) 750-9051
                                   Email: gmc@chaloslaw.com

<u>1. Duration</u>                                                                          23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period      24

of  6 ( Six)  months +/- 15 days in Charterers option  via safe ports , safe anchorages , safe berths. , but charterers have

to give notice in accordance with clause 10.                                                25

..................................... ..................................... .....................................      26

..................................... ..................................... ..................................... ..................................... ..................................... .....................................      27

..................................... ..................................... ................................. within below mentioned trading limits.      28

<u>2. Delivery</u>                                                                          29

The Vessel shall be placed at the disposal of the Charterers at  **dropping last outward sea pilot colombo port** at any time,

day or night, Sunday and holidays included.                                                30

From 20th - 31th  March 2009                                                     31

..................................... ..................................... ..................................... ..................................... ..................................... .....................................      32

..................................... ..................................... ..................................... ..................................... ..................................... ..................... The vessel on her delivery      33

shall be ready to receive **General, harmless/ lawful bagged/ bulk cargo** ('not exceeding the vessel's

tanktop strength') with clean-swept holds and tight, staunch, strong and in every way fitted for ordinary cargo service,      34

having water ballast and with sufficient power to operate all cargo-handling gear

simultaneously.                                                                            35

                                                                                           36

~~The Owners shall give the Charterers not less than    days notice of expected  of delivery and    days notice of definite date of~~      37

~~delivery.~~  Pls refer rider clause 10.                                                   38

<u>3. On-Off Hire Survey</u>                                                                39

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each jointly appoint an independent surveyors, for~~

~~their respective accounts, who at the delivery/redelivery respectively shall not later than at first loading port/last discharging~~      40

~~port respectively, conduct joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the~~

~~condition of the Vessel. A single report shall be prepared on each occasion and signed by each the surveyor, without~~      41

~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~      42

~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~      43

~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~      44

~~On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~      45

No onhire/ offhire bunker survey required. But, charterers have the option for carrying out  the bunker
survey with joint survey with owners at their expenses and time if needed in case of some
discrepancy of remaining on board bunkers                                                  46

                                                                                           47

<u>4. Dangerous Cargo/Cargo Exclusions</u>                                                  48

~~(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,~~      49

~~injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~      50

~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~      51

~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~      52

2

pass. Without prejudice to the generality of the foregoing, in addition the following are specifically   53

excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,   54

.............................................................................................................................................. ..   55

........................................ ...............................( seel clause 70) ......   56

..............................................................................................................................................   57

..............................................................................................................................................   58

..............................................................................................................................................   59

..............................................................................................................................................   60

..............................................................................................................................................   61

..............................................................................................................................................   62

..............................................................................................................................................   63

..............................................................................................................................................   64

(b) If IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to   65

tons and the Charterers shall provide the Master with any evidence he may   66

reasonably require to show that the cargo is packaged, labeled, loaded and stowed in accordance with IMO   67

regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at   68

the Charterers' risk and expense     See clause 70   69

**5. Trading Limits ( AS PER CLAUSE 85)**   70

The Vessel shall be employed in such lawful trades between safe ports and safe anchorages, safe berths AAAA   71

within Institute Waranty Limits excluding War and warlike zone, UN embargo area.
TRADING WITHIN Persian Gulf / Japan but not Iraq/ North of Hokkaido, pg/Japan **north of Hokkaido, North
of Tokyo/Korea/Russia but not north of Vladivostok but including Vostochny/ Nakhodka/SOUTH-
EAST ASIA, Bangladesh, India but excluding war and warlike zone VIA GOOD SAFE PORT (S), GOOD
SAFE BERTH (S), ALWAYS AFLOAT, ALWAYS ACCESSIBLE, ALWAYS WITHIN IWL, ALWAYLS HULL
UNDERWITERS' TRADING LIMIT. NO DIRECT CALL FROM PRC TO TAIWAN OR VICE VERSA ALLOWED
.**   72

.................. ..............................................................................................................Excluding   73

..............................................................................................................................................   74

..............................................................................................................................................   75

............................................................................................ as the Charterers shall direct.   76

**6. Owners to Provide**   77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for   78

all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; **fresh water, lubricating oil &**
shall pay for wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the   79

crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and   80

equipment for and during the service, and have a full complement of officers and crew.   81

  82

**7. Charterers to Provide**   83

| | |
|---|---|
| The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise | 84 |
| agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory | 85 |
| garbage disposal if any ), all communication expenses pertaining to the Charterers' business at cost, pilotages, | 86 |
| towages, agencies, commissions, consular charges (except those pertaining to individual crew members | 87 |
| or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel | 88 |
| puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all | 89 |
| such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew | 90 |
| shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while | 91 |
| the vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations~~ | 92 |
| ~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~ | 93 |
| ~~months or more.~~ | 94 |
| The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a | 95 |
| special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard | 96 |
| the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in | 97 |
| their time. Charterers to pay for hold cleaning bonus directly to crew  USD 1,000 lumpsum per voyage and USD2,700 on redelivery in lumpsum in lieu of hold cleaning including of removal / disposal of dunnage /debris together with charterers last hire | 98 |

## 8. Performance of Voyages

| | |
|---|---|
| | 99 |
| (a) The Master shall perform the voyages with due despatch, and shall render all customary assistance | 100 |
| with the Vessel's crew. The Master shall be conversant with the English **and Vietnamese** language and | 101 |
| (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards | 102 |
| employment and agency; and the Charterers shall perform all cargo handling, including but not limited to | 103 |
| loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk | 104 |
| and expense, under the supervision of the Master. | 105 |
| (b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or | 106 |
| officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if | 107 |
| necessary, make a change in the appointments. | 108 |

## 9. Bunkers

| | |
|---|---|
| | 109 |
| ~~(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and~~ | 110 |
| ~~diesel oil remaining on board the Vessel as hereunder. The Vessel ..............................shall be delivered with:~~ | 111 |
| ~~long*/metric* tons of fuel oil at the price of per ton;~~ | 112 |
| ~~tons of diesel oil at the price of per ton. The vessel~~ | 113 |
| ~~be redelivered with tons of fuel oil at the price of per ton;~~ | 114 |
| ~~tons of diesel oil at the price of per ton.~~ | 115 |
| ~~Same tons apply throughout this clause.~~ | 116 |
| (b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and | 117 |
| auxiliaries and which conform to the  standard specification(s)  RME 25 ( for fuel oil) & DMB (for diesel oil ). | 118 |
| The Owners reserve their right to make a claim against the Charterers for any damage to the main engines | 119 |

or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed     120

specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed     121

specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners     122

shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker     123

consumption, nor for any time lost and any other consequences.     124

**10. Rate of Hire/Redelivery Areas and Notices**     125

The Charterers shall pay for the use and hire of the said Vessel at the rate of     126

**USD   XXXXX per day including overtime of the crew in U.S. currency,** or $ U.S. currency per ton on the Vessel's total

deadweight     127

carrying capacity, including bunkers and stores, on summer freeboard, per 15 days,     128

commencing on and from the time of her delivery, as aforesaid, and at and after the same rate for any part     129

of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,     130

ordinary wear and tear excepted, to the Owners (unless Vessel lost) at **dropping last outward sea pilot**     131

**one safe port within Seasia – China range at any time, day or night, Sunday and holidays included.**     132

Charterers to pay **Ballast Bonus USD** ....( U.S.Dollars ..... ) in Lumpsum with first hire payment.     133

.............................. ..................................unless otherwise mutually agreed.     134

The Charterers shall give the Owners not less than **30/20/15 days approximate and 10/7/5/4/3/2/1 definite** days notice of the

Vessel's date and port of redelivery .     135

     136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be adjusted to G.M.T.     137

     138

**11. Hire Payment**     139

(a) Payment     140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in **Vietnam**     141

.............................,viz- **See clause 56** .. ............................... ............................... ...............................     142

.............................. ............................... ............................... ............................... ...............................     143

.............................. ............................... ............................... ............................... ...............................     144

.............................. ............................... ............................... ............................... ..................in     145

.............................. ..................................currency, or in United States Currency, in funds available to the     146

Owners on the due date, 15 days in advance, and for the last month or part of same the approximate     147

amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day     148

as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,     149

or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to     150

withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)     151

may otherwise have on the Charterers     152

at any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the     153

hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold     154

the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever     155

5

for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156

shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157

Charterers' account.    158

(b) Grace Period    159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors    160

or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161

**two** clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162

failure, and when so rectified within those two days following the Owners' notice, the payment shall    163

stand as regular and punctual.    164

Failure by the Charterers to pay the hire within **three** days of their receiving the Owners' notice as    165

provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11(a) above.    166

(c) Last Hire Payment    167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168

payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and the Charterers    169

may agree upon as being the estimated time necessary to complete the voyage, and taking into account bunkers **estimated**    170

**to be on board upon redelivery** ~~actually on board~~, to be taken over by the Owners and estimated disbursements for    171

the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the balance, day by day,    172

as it becomes due. When the Vessel has been redelivered, any difference is to be refunded by the Owners or paid    173

by the Charterers, as the case may be. Charterers have right to adjust the value of the redelivery bunkers and any other owners    
expenses from the last sufficient hire payment.    174

(d) Cash Advances    175

Cash to the master or cash for vessel's ordinary disbursements at any port may be advanced by the Charterers, as required by    176

the Owners, subject to 2.5% commission and such advances shall be deducted from the hire.    177

~~The Charterers, however, shall in no way be responsible for the application of such advances.~~    178

**12. Berths**    179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe anchorage that    180

Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat    181

at any time of tide.    182

**13. Spaces Available**    183

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can    184

reasonably and safety stow and carry), also accommodations for supercargo, if carried, shall be at the    185

Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,    186

apparel, furniture, provisions, stores and fuel.    187

~~(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the~~    188

~~Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a~~    189

~~result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.~~    190

**14. Supercargo and Meals**    191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers    192

risk and see that voyages are performed with due despatch. He is to be furnished with free **and suitable** 193

accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of 194

**USD 15** per day. The Owners shall victual pilots and customs officers, and also, when 195

authorized by the Charterers or their agents in writing, shall victual tally clerks, stevedore's foreman, etc., 196

Charterers paying at the rate of **USD 10** per meal for all such victualling. 197

<u>**15. Sailing Orders and Logs**</u> 198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing 199

directions, in writing, in the English and the Master shall keep full and correct deck and engine 200

logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the 201

Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, showing the 202

course of the Vessel, **speed,** distance run, **direction of wind and sea** and the consumption of bunkers. Any log extracts 203

required by the Charterers shall be in the English language. 204

~~**16. Delivery/Cancelling**~~ 205

~~If required by the Charterers, time shall not commence before and should the~~ 206

~~Vessel not be ready for delivery on or before but not later than hours,~~ 207

~~The Charterers shall have the option of cancelling this Charter Party.~~ 208

~~*Extension of Cancelling*~~ 209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready~~ 210

~~For delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty~~ 211

~~The date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is~~ 212

~~expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will~~ 213

~~cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two~~ 214

~~days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date~~ 215

~~of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the~~ 216

~~Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers~~ 217

~~in accordance with this Clause.~~ 218

<u>**17. Off Hire**</u> 219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency 220

of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the 221

arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, 222

agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless 223

resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or 224

painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of 225

hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back 226

during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident 227

to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time 228

of her deviating or putting back until she is again in the same or equidistant position from the destination 229

| | |
|---|---|
| and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' | 230 |
| account. In the event of the Vessel being driven into port or to anchorage through stress of weather, | 231 |
| trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses | 232 |
| resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be | 233 |
| reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and | 234 |
| the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses should be | 235 |
| deducted from the hire. | |

**In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or Owners' store, break-down of machinery, damage to hull or other accident, either hindering or preventing the working of the Vessel and continuing for more than twelve consecutive hours, no hire to be paid in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance to be adjusted accordingly.** 236

**18. Sublet** 237

Subject to Owners agreement, Charterers shall have liberty to sublet the Vessel to First Class Charterers 238

for all or any part of the time covered by this Charter Party against their letter of Indemnity as in Owners' P. and I. wordings 239

but former Charterers remain responsible for the fulfilment of this Charter party. Acceptance of delivery of the vessel

shall not constitute any waiver of Charterers' right under this Charter party. 240

However, Charterers guarantee that sub-Charterers shall not resublet the vessel to other nominees.

**19. Drydocking** 241

~~The Vessel was last drydocked.................................................................................................................................~~ 242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~ 243

~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~ 244

~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~

Except in case of emergency including bottom cleaning and painting and/or repair as required by class or 245
dictated by circumstances, no dry docking shall take place during the currency of this Charter Party.

~~*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter~~ 246

~~Party.~~ 247

* delete as appropriate 248

**20. Total Loss** 249

~~Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or~~ 250

~~being last heard of) shall be returned to the Charterers at once.~~ 251

**21. Exceptions** 252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the 253

seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always 254

mutually excepted. 255

**22. Liberties** 256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels 257

in distress, and to deviate for the purpose of saving life and property.                    258

### 23. Liens                                                                               259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due    260

Under this Charter Party, including general average contributions, and the Charterers shall have a lien on    261

the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be    262

returned at once.                                                                           263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,    264

which might have priority over the title and interest of the Owners in the Vessel. The Charterers    265

undertake that during the period of this Charter Party, they will not procure any supplies or necessaries    266

or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.

**In no event shall Charterers procure, or permit to be procured for the vessel, any supplies necessaries or services**
**without previously obtaining a statement signed by an authorized representative of the furnished thereof,**    267
**acknowledging that such supplies, necessaries or service are being furnished on the credit of Charterers and not on**
**credit of the vessel or her Owners, and that the furnisher claims no maritime lien on the vessel therefore.**

### 24. Salvage                                                                             268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting    269

Owners' and Charterers' expenses and crew's proportion.                                     270

### 25. General Average                                                                     271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any    272

subsequent modification thereof, in **Singapore** and settled in **U.S.Dollars**    273

currency.                                                                                   274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will    275

contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules    276

~~1974, as amended 1990,~~ **1994** or any subsequent modification thereof and will include the "New Jason    277

Clause" as per Clause 31.                                                                    278

Time charter hire shall not contribute to general average.                                  279

### 26. Navigation                                                                          280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners    281

shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,    282

and all other matters, same as when trading for their own account.                          283

### 27. Cargo Claims                                                                        284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club    285

New York Produce Exchange Agreement of February 1970, as amended ~~May, 1984,~~ 1st September, 1996 or any subsequent    286

modification or replacement thereof                                                         287

### ~~28. Cargo Gear and Lights~~                                                           288

~~The Owners shall maintain the cargo handling gear of the Vessel which is as follows~~    289

.................................................................................................    290

.................................................................................................    291

9

........................................................................................................................................ 292

~~providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also~~ 293
~~provide on the Vessel for night work lights as on board, but all additional lights over those on board shall~~ 294
~~be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If~~ 295
~~required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the~~ 296
~~Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or~~ 297
~~insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that~~ 298
~~time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned~~ 299
~~thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If~~ 300
~~required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which~~ 301
~~case the Vessel shall remain on hire.~~ 302

~~**29. Crew Overtime**~~ 303
~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~ 304
~~the Charterers shall pay the Owners, concurrently with the hire ................................. per month~~ 305
~~or pro rata.~~ 306

~~**30. Bills of Lading**~~ 307
~~(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates~~ 308
~~or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the~~ 309
~~Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts~~ 310
~~(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall~~ 311
~~indemnify the Owners against all consequences or liabilities which may arise from any inconsistency~~ 312
~~between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master~~ 313
~~at their request.~~ 314
~~(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and~~ 315
~~Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for~~ 316
~~Any loss, damage, expense or delay howsoever caused."~~ 317

**31. Protective Clauses** 318
~~This Charter Party is subject to the following clauses all of which are also to be included in all bills of~~ 319
~~lading or waybills issued hereunder.~~ All Bills of Lading or Waybills signed hererunder shall contain or to be deemed to 320
contain the following clauses:

(a) CLAUSE PARAMOUNT 321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the 322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national 323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall 324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the 325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said 326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such 327
Term shall be void to that extent, but no further." 328

10

| | |
|---|---|
| and | 329 |

(b) BOTH-TO-BLAME COLLISION CLAUSE | 330

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any | 331

act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in | 332

the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against | 333

all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents | 334

loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other | 335

or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the | 336

other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. | 337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or | 338

objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or | 339

contact." | 340

and | 341

(c) NEW JASON CLAUSE | 342

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage | 343

resulting from any cause whatsoever, whether due to negligence or not, for which, or for the | 344

consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, | 345

shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the | 346

payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, | 347

and shall pay salvage and special charges incurred in respect of the goods. | 348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship | 349

or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover | 350

the estimated contribution of the goods and any salvage and special charges thereon shall, if required, | 351

be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." | 352

and | 353

(d) U.S. TRADE – DRUG CLAUSE | 354

"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the | 355

Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested | 356

narcotic drugs and marijuana to be loaded or concealed on board the Vessel. | 357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences | 358

of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel | 359

harmless and shall keep them indemnified against all claims whatsoever which may arise and be made | 360

against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, | 361

as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account | 362

and the Vessel shall remain on hire. | 363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this | 364

clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable | 365

time the Vessel is released and at their expense put up the bails to secure release of the Vessel. | 366

~~The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the~~ 367
~~event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the~~ 368
~~Vessel's personnel.¹~~ 369
and 370
~~(e) WAR CLAUSES~~ 371
~~(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the~~ 372
~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~ 373
~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~ 374
~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~ 375
~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~ 376
~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~ 377
~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~ 378
~~the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not~~ 379
~~exceeding a valuation of ........................................ ................................ In addition, the Owners may purchase and the~~ 380
~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight, disbursements,~~ 381
~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~ 382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ 383
~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~ 384
~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~ 385
~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~ 386
~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ 387
~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~ 388
~~Charterers' account." see clause 67~~ 389

### 32. War Cancellation 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or 391
more of the following countries **Iran, Iraq, United States of America, Russia, Great Britain, France,** 392
**Japan, Germany and China**.................. ................................ ................... ............................ ................................ 393
.................. ................................ ................... ............................ ................................ 394
.................. ................................ ................... ............................ ................................ 395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall 396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after 397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near 398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she 399
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall 400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this 401
Charter Party shall apply until redelivery. 402
### 33. ~~Ice "BIMCO Ice Clause"~~ 403
~~The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area~~ 404

~~where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is~~ 405
~~risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and~~ 406
~~remain in the port or area or to get out after having completed loading or discharging. Subject to the~~ 407
~~Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her~~ 408
~~size, construction and ice class.~~

The vessel not to be ordered to nor bound to enter any ice-bound place or any place where lights, lightship, marks and buoys are or are likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk that ordinary the vessel will not able on account of ice to reach the place or to get out after having completed loading or discharging. The vessel not to be obliged to force ice, nor to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen in and/or damaged, he has the liberty to sail to a convenient open place and await the Charterers' fresh instructions. Detention through any of the above causes to be for the Charterers' account. 409

~~**34. Requisition**~~ 410
~~Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter~~ 411
~~Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid~~ 412
~~by the said government in respect of such requisition period shall be retained by the Owners. The period~~ 413
~~during which the Vessel is on requisition to the said government shall count as part of the period provided~~ 414
~~for in this Charter Party.~~ 415
~~If the period of requisition exceeds 02 months, either party shall have the option~~ 416
~~of cancelling this Charter Party and no consequential claim may be made by either party.~~ 417

~~**35. Stevedore Damage**~~ 418

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all~~ 419
~~damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their~~ 420
~~agents in writing as soon as practical but not later than 24 hours after any damage is discovered. Such~~ 421
~~notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent~~ 422
~~of such damage.~~ 423
~~(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew~~ 424
~~and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs~~ 425
~~of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed~~ 426
~~and if required passed by the Vessel's classification society.~~ 427
~~(b) Any and all damage (s) not described under point (a) above shall be repaired at the Charterers' option,~~ 428
~~before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will~~ 429
~~be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for~~ 430
~~which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the~~ 431
~~Owners' work.~~ 432

**36. Cleaning of Holds** 433

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between 434
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by 435

13

local regulations at the rate ... per hold. In lieu of hold cleaning including FW wash down, Charterers shall pay to crew members directly USD 1000 in lumpsum per voyage and to Owners directly USD 2700 in lumpsum on redelivery including removal/ disposal of dunnage/ debris together with last Charter hire. 436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not 437

accepted or passed by the port or any other authority. The Charterers shall have the option either to re-deliver 438

~~the Vessel with unclean/unswept holds against a lumpsum payment of ........... in lieu of cleaning. Or alternatively, Charterers~~ 439

~~to pay this amount directly to Master of the vessel.~~

440

~~37. Taxes~~ 441

~~Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners~~ 441

~~resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter~~ 442

~~Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding~~ 443

~~taxes levied by the country of the flag of the Vessel or the Owners).~~ 444

445

~~38. Charterers' Colors~~ 445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~ 446

~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~ 447

~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~ 448

~~shall be for Charterers' account.~~ 449

450

~~39. Laid Up Returns~~ 450

~~The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their~~ 451

~~underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum~~ 452

~~period of 30 days if on full hire for this period or pro rata for the time actually on hire.~~ 453

454

40. Documentation 455

The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455

Vessel to trade within the agreed trade limits, including, ~~but not limited to certificates of financial~~ 456

~~responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'~~ 457

~~P & I club,~~ valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458

of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. **Charterers agree that Owners'** 459

**obligation in this respect are limited to rules and regulations in force at the date of this C/P.**

460

41. Stowaways 460

(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining 461

access to the Vessel by means of secreting away in the goods and/or containers shipped by the 462

Charterers. 463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained 464

access to the Vessel by means of secreting away in the goods and/or containers shipped by the 465

Charterers, this shall amount to breach of charter for the consequences of which the Charterers 466

shall be liable and shall hold the Owners harmless and shall keep them indemnified against all 467

claims whatsoever which may arise and be made against them. Furthermore, all time lost and all 468

expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account 469
and the Vessel shall remain on hire. 470
(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to 471
Sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a 472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the 473
Vessel. 474
(b) (i) If despite the exercise of due care and diligence by the Owners, stowaways have gained 475
access to the Vessel by means other than secreting away in the goods and/or containers shipped 476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including 477
fines, shall be for the Owners' account and the Vessel shall be off hire. 478
(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel 479
by means other than secreting away in the goods and/or containers shipped by the Charterers, 480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel 481
is released and at their expense put up bail to secure release of the Vessel. 482

### 42. Smuggling
483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any 484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. 485

### 43. Commissions
486

~~A commission of ———— percent is payable by the Vessel and the Owners to~~ 487
1.25 % to BRISK MARINE SERVICES....................... 488
................................ ................................ ................................ ................................ ............................ 489
................................ ................................ ................................ ................................ ............................ 490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter 491

### 44. Address Commission
492

~~An address commission of ———— percent is payable to~~ 493
2.50 percent address commission payable to charterers ....... ................................ ................................ .. 494
................................ ................................ ................................ ................................ ............................ 495
................................ ................................ ................................ on hire earned and paid under this Charter. 496

### ~~45. Arbitration~~
497

~~(a) NEW YORK~~ 498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~ 499
~~subject to U.S. Law:~~ 500
~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their~~ 501
~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~ 502
~~agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with~~ 503
~~shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of~~ 504
~~Maritime Arbitrators Inc.~~ 505
~~For disputes where the total amount claimed by either party does not exceed US $ **~~ 506

~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~ 507

~~of Maritime Arbitrators Inc.~~ 508

(b) LONDON 509

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree.............. 510

forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business 511

in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, 512

one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No 513

award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as 514

above, unless objection to his action be taken before the award is made. Any dispute arising hereunder 515

shall be governed by English Law. 516

For disputes where the total amount claimed by either party does not exceed US $ ** 517

the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime 518

Arbitrators Association.

519

**All disputes/claims arising out of this contract shall be settled in LONDON with English laws** 520

*\* Delete para (a) or (b) as appropriate* 521

*\*\* Where no figure is supplied in the blank space this provision only shall be void but the other provisions* 521

*of this clause shall have full force and remain in effect.* 522

If mutually agreed, clauses **46 to 83** both inclusive, as attached hereto are fully 523

incorporated in this Charter Party. 524

**For Owners**                     **For Charterers**

**VINALINES SHIPPNG COMPANY**        **SHIPPING LAND - KOREA**

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

46. Vessel's specification:

| | |
|---|---|
| Vessel Name: | TAY SON 3 |
| Built: | 2005 at Ha Long shipyard, Vietnam |
| GT/NT: | 8,216 / 5,295 |
| LOA | 136.40M |
| LBP | 126.00 M |
| BREADTH | 20.20M |
| DEPTH | 11.30M |
| DRAFT | 8.35M |
| DWT | 13,285.2 |

M/E: Akasaka Mitsubishi 7UEC33LS II - 3965 Kw (5390 Ps)/Set x 215 rpm x 01 set

Classification: NK
Cargo gear: Derricks 20 mts x 4 sets x 25 m
Design Speed : 14.70 Knots
Service Speed: 11.5 Knots, 1 knot tolerant

Daily Consumption:
- Main Engine:     15.5Mts IFO (180cst) /day
- Generators:
+ D/E: Yanmar - 355 Kw (483 PS)/set x 1,200 RPM x 2 Sets
+ Mail Generator: AC 440V x 3PH x 60 Hz x 375KVA (300KW)x 1200 RPM Brush - less type x 2 sets
- Cargo working : 3.40 Mts DO/day
- At Sea        : 1.75 Mts DO/day
- Idle          : 1.75 Mts DO/day
- Boiler: 0.6 Mts IFO/day

(All the above figures for speed and consumption are based on 8.35 M design draft in the condition of clean bottom, good weather, calm sea i.e. wind force not exceeding beaufort 2, douglas sea state 1 and reasonable trim in deep water with clean underwater area, max sea temperature 30 degrees Celcius and no negative influence by swell current and/or tidal streams.)

The service capacities of bunker and fresh water:
    FW/DO/FO: 242 / 110 / 600 Mts

4 holds/ 4 hatchs single decker

| Hold's dimens | LxBxH (m) | Cargo Hatchs | L x B (m) |
|---|---|---|---|
| Hold No.1 | 24.00x18.2x9.95 | Hold No.1 | 18.3x10.8 |
| Hold No.2 | 23.76x19.6x9.95 | Hold No.2 | 18.72x11.4 |
| Hold No.3 | 24.48x19.6x9.95 | Hold No.3 | 19.44x11.4 |
| Hold No.4 | 24.48x19.2x9.95 | Hold No.4 | 19.44x11.4 |

Tank top load: 10.08 mt/m2
Upper deck load: 1.60 mt/m2

1

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

Hatch cover:  no.1      :  2.08 mt/m2
              no.2/3/4  :  1.75 mt/m2

Ventilation System (in hold): Mechanical
Cargo batten fitted: NIL
Hatches' cover: Pontoon

## **Cargo Hold's Capacities**

| Bales | Hold No.01 | Hold No.02 | Hold No.03 | Hold No.04 | Total |
|---|---|---|---|---|---|
| M3 | 3,781 | 4,654 | 4,810 | 4,499 | 17,774 |
| Ft3 | 133,510 | 164,330 | 169,840 | 158,850 | 626,530 |

| Grain | | | | | |
|---|---|---|---|---|---|
| M3 | 4,012 | 4,850 | 5,009 | 4,729 | 18,600 |
| Ft3 | 141,670 | 171,250 | 176,870 | 166,980 | 656,770 |

Owners Vinalines Shipping Company (Vinalines)

All details are about without guarantee.

47. Charterers agree their Agents undertake ship's husbandry as Owner's agent against Owners payment of actual expenses incurred plus normal agency fee in accordance with the agents tariff. However, for extraordinary business (such as major repairs, drydocking and general average of the vessel), Owners always to appoint their own Agents.

48. The Charterers shall be under no responsibility for all consequences (including loss of time) of oil pollution damage caused by vessel and any failure or inability of the Owners to do so as provided for above and any loss of time thereby to be off-hire.

49. Invoices/vouchers/disbursements for owners account are to be presented by Charterers to owners not later than 02 months after occurrence for invoices.

50. Through the period of service under this charter, Owners warrant the vessel will maintain the speed and the consumption stated in vessel's description –clause 46, on all sea passages from pilot station of sailing port to pilot station of calling port.

51. Should the vessel be lost or suffered from the act of God, enemies, fire and all dangers and accidents, damage or disaster of the Seas, rivers, machinery, boilers, and navigation, and errors of navigation or whatsoever throughout this charter, the voyage may be declared as abandoned. Since then, the Owners/ Charterers will be responsible for their vessel/cargo respectively. Further more, all time lost and all expenses whatsoever and howsoever incurred, including fines regarding the vessel/cargo shall be for the Owners/Charterers' account respectively.

2

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

52.    Hamburg Rules Clause

Charterers; sub-Charterers and/or their Agents are hereby authorized by Master and Owners to sign B(s)/L on Master's and/or Owners' behalf. Bill(s) of lading as presented in accordance with Mate's and tally clerks' receipts without prejudice to this charter party but Charterers to accept all consequences that might result from Charterers' and/or their Agent's signing bill(s) of lading not adhering to the remarks in Mate's or Tally clerk's receipt. Charterers or their nominated bill(s) of lading shall be issued and used.

Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

53.    Bunker on delivery/ Redelivery: Charterers on delivery and Owners on redelivery to take over and pay for estimated bunkers ROB. Payment for bunkers on delivery to be paid together with the first charter hire. Value of bunkers on redelivery to be deducted from last hire payment. Bunkers to be on board on delivery(IFO/ MDO : abt xxxmt/abt xxmt - to be advised) and on redelivery to be about same quantity as on delivery but sufficient to reach main bunkering port. Bunker prices to be applied at Owners' last purchase invoice on delivery and redelivery respectively. (Owners last purchase prices do/fo usdxxx/usdxxx pmt - to be advised)

No onhire/ offhire bunker survey required.  Time of delivery/ redelivery and bunkers on delivery/ re-delivery to be ascertained by Master's report. Charterers and Owners to excercise due diligence to avoid unreasonable delays.

54.    Charterers shall pay to USD 1500.00 in lumpsum per month pro rata for communication ( including cable/ telax/ phone) , entertainment/ victualling/ fee. Self-pilotage to be settled between Master and Charters under direct negotiation.

55.    Hire to be telegraphically transferred to:

CORRESPONDENCE BANK: STANDARD CHARTERED BANK, NEWYORK
SWIFT CODE: SCBLUS33XXX
BANK: VIETNAM MARITIME COMMERCIAL JOINT STOCK BANK, HANOI
BRANCH
BENEFICIARY : VINALINES SHIPPING COMPANY
SWIFT CODE:   MCOBVNVX002
USD ACCOUNT: 030.01.37.022181.4

56.    Vessel to be delivered with about ....mt IFO( 180 cst) & about .... mt MDO  and redelivered about the quantity as on delivery but sufficient to reach nearest  main bunkering port . Bunker prices to be applied at owners last purchase invoice on delivery and redelivery respectively. Owners shall advise estimated quantity of delivery bunker to Charterers 7 days before delivery.

Payment for bunker on delivery to be paid together with the first hire. Value of bunkers on redelivery to be deducted from sufficient last hire payment.

3

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

<u>57.</u> Watchmen and garbage costs:

Gangway watchmen if ordered by Master for ship to be for Owners' account but watchmen for cargo and compulsory watchmen to be for Charterers' account. Garbage disposal to be for charterers account in case of compulsory disposal only.

<u>58.</u> Boat/ Taxi hire:

Boat hire (or Bus hire) for Charterers' business to be for Charterers' account and for Owners' business to be for Owners' account. But in case it is unclear whether the boats/ taxies or buses are used for Charterers' business or Owners' business, the hire to be equally shared between Owners and Charterers.

<u>59.</u>  Charterers shall furnish the Captain from time to time with all requisite instructions and sailing direction. Charterers to provide Owners prior to delivery and, in case of changes during the period of this Charter, in regular intervals with vessel's itinerary and with postal address of all agents, stevedores, and suppliers including bunker suppliers who shall be used by Charterers to render any work, services or supplies to the vessel and for which Charterers are liable under the terms of the Charter Party.

<u>60.</u>  Export and/or import permits for all cargo to be at Charterers' risk and expense. Charterers to obtain and be responsible for all necessary permits to enter and/or trade in and out ports during the currency of this charter at their own risk and expense. Taxation or levies whatsoever for these purpose to be for Charterers' account and to be paid by Charterers.

<u>61.</u>  Crew bonus and all stipulated in C/P, crew bonus for charterers voyage performance if require to be for charterers account and will paid by Charterers and settled with crew directly.

<u>62.</u>  Tax clause: All dues, duties, charges and/or taxes on the vessel and on crew and/or stores to be for Owners' account. All taxes and dues ,charge on the cargo and freight , charter hire to be  for charterers account  and arising out of cargo carried or ports visited under this charter party shall be for Charterers' account. Any taxes/dues/costs incurred by Owners' bank are for Owners' account and by any taxes/dues of Charterers' bank are to be for Charteres' account.

<u>63.</u>  During the currency of this Charter, should the vessel be off-hire for a continuous period of more than 30 consecutive days Charterers/Owners have the liberty of canceling this Charter party. Charterers/Owners have to inform Owners/Charterers at least 7 days in advance before exercise their right. Otherwise the C/P will be maintained in force.

<u>64.</u>  The vessel to have the liberty of using diesel oil when entering and leaving port and for maneuvering in shallow narrow waters.

4

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

65. Boycott: In the event of the vessel being subjected to boycott, being delayed or rendered inoperative by strikes, labor stoppages or any other difficulties arising from the vessel's flag, ownership, crew or terms of employment of crew of the chartered vessel or any other vessel under same ownership operation or control, such time lost is to be considered as off-hire. Owners guarantee that on delivery the minimum terms and conditions of employment of the crew of the vessel will be covered by a contract acceptable to the International Transport Workers Federation or equivalent or by a bone fide trade union agreement acceptable to the International Transport Workers Federation or equivalent, and will remain so during the duration of the charter period.

66. Charterers have the liberty as part of the proposed voyages under this time charter of ordering the vessel to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the said voyages whatsoever, whether such ports are on or off the direct and / or customary routes between any of the ports of loading  and /or discharging for which the vessel is scheduled, and may there take oil bunkers in any quantity in the discretion of Charterers even to the full capacity of fuel tanks and deep-tanks and any other compartment in which oil is normally carried, whether such amount is or is not required for the voyage or voyages in question. In the event of the Charterers taking bunker oil in the compartment which can normally be used for the carriage of either bunker oil or cargo, but which is clean at the time the bunker oil is shipped, Charterers undertake to clean same at their own expense and in their own time, either before or on completion of this Charter Party, if the Owners so desire.

67. War clause: "The Baltic Conference War Risk clause for time charter 1939 (CONWAR TIME)"

(A) The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risk, or penalties whatsoever consequence upon the imposition of Sanction, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B) Should the Vessel approach or be brought or ordered within such zone. or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the Vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11 hire to be paid for all time lost including any lost owing to loss of or injury to the Master, Officers, or Crew or to the action of the Crew in refusing to proceed to such zone or to be exposed to such risks.

(C) In the event of the wages of the Master, Officers and/or Crew or the cost of provisions and/or stores for deck end/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added

5

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D) The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel right to give any such orders or directions.

(E) In the event of the nation under whose flag the Vessel sails becoming involved in war, hostilities, warlike operations, revolution, or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the Vessel to be re-delivered to the Owners at the port of destination or, if prevented through the provisions of section (A) from reaching or entering it. then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

(F) If in compliance with the provision, of this clause anything is done or is not done, such not to be deemed a deviation

68.   Deck cargo: Subject to master's agreement and permission charterers have option to load cargo on deck at their expenses and liability i.e no claim for loss or damage to the deck cargo. The weight of cargo on deck shall not exceed the upper deck and hatch strength and loaded at Master's discretion.

69.   The vessel is fit for grab discharge and no cargo shall be loaded in places inaccessible to grabs or in deep-tanks. The Charterers have the privilege of using trucks, bulldozers and grabs in the holds. The Owners are to ensure that all exposed pipes and other equipment are sufficiently protected, failing which the Charterers are not to be liable for any inadvertent stevedore damage. The unit weight of the bulldozer will not exceed the vessel's tank-top strength.

70.   Cargo Exclusions

None of cargoes, goods, or substances listed below are to be loaded dring the currency of this Charter Party:

Logs, war materials (arms, ammunitions, detonators, tnt, dynamite, bombs, black powder, blasting caps, rockets), explosive and/or combustible materials, radioactive and/or nuclear prods and/or their wastes, radioisotopes, acids, charcoal, asphalt, tar, pitch, motor blocks, turnings, salt in bulk, ammonium nitrate calcium carbide,, calcium hypochlorite, caustic potash, hides, ferrosicilicon, naphta, livestock, bulk cement, crfosoted goods, fishmeal, sunflower seed expellers, oilcakes, bones, oily pices, motor spirit, carbide, alumina, caustic soda, querracho, gaseous coal, zinc ashes, asbestos, borax in bulk, sponge iron, direct reduced iron ore pellets, corrosives, petroleum, charcoal in gunny bags, petroleum derivatives and all its products, Met/Petcoke is always allowed  inflammable or injurious cargoes, imo cargoes and other unlawful cargoes.

71.   Stevedore Damage:

Stevedores to be appointed and paid by Charterers, but to work under the supervision of Master. Should any damage be caused to the vessel or her fittings by stevedores, at the first, Master has to try to let stevedores repair the damage and will try to settle the matters directly with them. If the damage cannot be repaired by

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

stevedores, Master has to try to obtain written acknowledgement of the damage and liability from stevedores. In case of failure of the above, Master to corporate with Charterers or their agents in order to obtain the written acknowledgement by the responsible party. Charterers are not to be responsible for the stevedores' damage or other damage to the vessel, unless Charterers and their agents and notified in writing by the Master at the time of occurrence of the damage or as soon as possible thereafter.

72.    In case vessel need to have fumigation, if crew are not allowed to stay on board, Charterers have to pay crew's accommodation, transportation and meals. If the crew are allowed to stay on board, Charterers to give USD 20.00 per person per day as bonus.

73.    All berthing/ unberthing by done by crew, crew bonus of extra work or for encouragement will be paid by Charterers and settled with crew directly.

74.    At each port, only first opening and last closing of hatch cover operation to be for Owners' account. The Charterers have to pay/settle the intermediate hatch operations  expect normal opearation by bad weathe ( rain/ etc) or emergency , hold cleanings and Master's self-pilotage to crew and Master directly by their tariff.

75.    Master has the right to reject unsound/damaged cargo and ask for replacement but Master have to accept the charters reasonable written instruction for cargoes matter but always subject to owners agreement. Vessel always to remain on-hire for such action. Bills of lading to be issued in strict conformity to Mate's receipt.

76.    Heavy Coils:
Heavy coils to be loaded in 1.5-2.0 tiers not exceeding tanktop-strength in average in accordance with loading manual of steel mills, and  lashed/dunnaged under supervision of master, and all Dunnage / lashing / securing to be for Charterers' account/risk/expenses at Master's discretion and upto Master's Satisfaction.

77.    BILLS OF LADING :

Charterers and or their agents to be authorize by owners to sign Bill(s) of lading on behalf of master in presented strictly in accordance with mate's or tally receipt without prejudice to this c/p.
Charterers' form of Bill(s) of Lading to be used under this charter party . Charterers  and /or their agents to be authorized by  Owners or Master to sign Bill(s) Lading on Master's behalf as presented strictly in accordance with the Mate's receipts without prejudice to this charter party. However charterers to accept all the consequences that might result from the charterers and /or their agents signing bills of ladings not adhering to the remarks in Mate's receipts.

Bills of lading for deck cargo to be claused accordingly and shipped at Charterers/Shippers /Receivers

7

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

risks. For Indian-bound trade, Charterers have right to issue second sets of bills of ladings if required/ necessary depending on the cargo/ port/ trade requirement against charterers L.O.I in owners P & I wordings without any surcharge to owners. In this case, Charterers to be liable for collecting the full set of the 1st bills of lading and surrendering to Owners in redemption of Charterers' LOI within 30 days after such an issuance.

Bills of lading for deck cargo to be claused accordingly and shipped at Charterers/Shippers /Receivers risks.

Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

78. Off-hire:

Should the vessel to be off-hire for any/all time lost, Owners to pay all expenses incurred directly related to the vessel, together with the cost of any fuel/gas/diesel oil consumed in consequence thereof, which shall all be deducted from the hire. However, Charterers to grant Owners with 12 (twelve) consecutive hours to rectify any off-hire cause. In case of more than 12 (twelve) consecutive hours needed, no hire to be paid in respect of any time lost thereby during the peirod in which the vessel is unable to perform the service immediately required. Any hire paid in advance to be adjusted accordingly.

79. Cargo release without original Bs/L:

Should original bill(s) of lading not arrive at discharging port in time, then Charterers may request that Owners to release entire cargo without presentation of original B(s)/L against Bank Guarantee, or in Charterers' option against Charterers Letter of Indemnity in Owners P and I wordings but Charterers shall endeavour to submit bank guarantee for cargo release prior to arrival . After completion of each voyage, Charterers are held responsible to collect all the original endorsed Bills of Lading from parties concerned and courier to Owners at the earliest possible.

The Charterers undertake and agree that they shàll indemnify and hold the Owners harmless against all consequences arising from the Owners conforming to the Charterers' request in releasing cargo without production of original Bills of Lading.

The Charterers are to issue a single Letter of Indemnify to the Owners in accordance with "Standard P&I Club" wording.

80. Whenever under the terms of this contract, Owners may be responsible for loss of time, costs, expenses and consequences as result of being off hire. Commercial losses to be expressively excluded.

81. Major's war:

If war breaks out (weather there be a declaration of war or not) between any 2 (two) or more of he following countries:

Iraq, Iran, United Kingdom, United States of America, Russia, The People's Republic of China, Thailand, and Japan directly affecting performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall deliver the vessel to Owners, if she has cargo on board after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and

RIDER CLAUSES
MV TAYSON 3- AC SHIPPING LAND
CPD 05TH MARCH 2009

safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by charterers. In all cases hire shall be paid in full until the vessel's redelivery.

82.  Insurance:

Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for hull, machinery, and Officers/ crew as well as crew war bonus and any other expenses, if any, due to the vessel's trading to the restricted area shall be for Charterers' account.

83.  Incorporating Clause:

New Jason clause, New Both-to-Blame Collisions clause, Chamber of Shipping War Risks clause 1 and 2, Hague Visby Rules Legislation shall be deemed to be incorporated in this Charter party and Bills of Lading issued hereunder.

84.  All negotiations and eventual fixture to be kept strictly private & confidential.

85.  Trading limits:

The vessel shall be employed in such lawful trades between safe ports and safe places always via sp(s), sb(s), aaaa within Institute Warranty Limits excluding War and warlike zone, UN embargo area. TRADING WITHIN PG/JAPAN but not iraq/ North of Tokyo/Korea/Russia but not north of Vladivostok but including Vostochny/ Nakhodka/SOUTH-EAST ASIA, Bangladesh, India but excluding war and warlike zone via good safe port (s), good safe berth (s), always afloat, always accessible, always within iwl, alwayls hull underwiters' trading limit. no direct call from PRC to taiwan or vice versa allowed.

The vessel not to be ordered to nor bound to enter any ice-bound place or any place where lights, lightship, marks and buoys are or are likely to be withdrawn by reason of ice on the vessl's arrival or where there is risk that ordinary  ther vessel will not able on account of ice to reach the place or to get out after having completed loading or discharging. The vessel nor to be obliged to force ice, not to follow ice-breakers when inwards bound. if on account of ice the Master consider it dangerous to remain at the loading or discharging place for fear of there vessel being frozen in and/or damaged, he has the liberty to sail to a convenient open place and await the Charterers' fresh instructions. Detention through any

of the above causes to be for the Charterers' account.

For Owners                                      For Charterers

**VINALINES SHIPPNG COMPANY**                 **SHIPPING LAND - KOREA**

# EXHIBIT 2



# SL SHIPPING  PTE  LTD

**SLS**

3 Rivervale Link,  #06-26  The Rivervale,  Singapore 545119

## STATEMENT OF ACCOUNT

DATE : 27TH AUG. 2009

| | | | IFO | MGO |
|---|---|---|---|---|
| MV 'TAY SON 3' CP DD 13 AUG. 2009 | | | | |
| DELIVERY | 2009-08-15 16:01 GMT | BOD | 278.980 | 44.040 |
| REDELIVERY | GMT | BOR | | |
| DURATION | 30.000000 DAYS | | | |

| DESCRIPTION | | DEBIT | CREDIT |
|---|---|---|---|
| **1ST HIRE** | | | |
| Period | 16:01 GMT 15 AUG 2009 ~ 16:01 GMT 14 SEP '09 | | |
| Rate | USD 5,400.00/DAY | | |
| Day | 30.000000        DAYS | | $162,000.00 |
| | | | |
| **C/E/V** | 30.000000 DAYS X USD 1,500 / 30 DAYS | | $1,500.00 |
| | | | |
| **LESS** | | | |
| Commission | 2.5% comm for Tumayship,Istanbul | $4,050.00 | |
| | | | |
| **BOD** | IFO 278.980 MT X USD 450 | | $125,541.00 |
| | MDO 44.040 MT X USD 630 | | $27,745.20 |
| | | | |
| **TOTAL** | | $4,050.00 | $316,786.20 |
| **DUE TO OWRS** | | **$312,736.20** | |
| | | $316,786.20 | $316,786.20 |

**BANKING DETAIL**

| | |
|---|---|
| Bank | **DBS Bank, Shenton Way Branch** |
| | **6 Shenton Way, DBS Building, Singapore 068809** |
| Swift code | **DBSSSGSG** |
| Beneficiary | **SL Shipping Pte Ltd** |
| Account number | **0012 – 000827 – 01 – 0 – 022** |

**End of statement**



EXHIBIT 3

## ADDENDUM NO.1  MV.TAYSON 3
### FIXTURE NOTE DATED 25TH AUGUST 2009

IT IS THIS DAY 25TH AUGUST 2009 MUTUALLY AGREED BETWEEN M/S.SILVERSHIPS LTD /
HONGKONG AS OWNERS AND M/S. RUYI KOREA CO LTD, S.KOREA AS CHARTERERS
ON THE FOLLOWING TERMS & CONDITIONS:

1. TOTAL CARGO QUANTITY  : 10,500 MT (DETAILS AS BELOW)

   ABT 3500 MTS OF STEEL COIL ( MAX 25MT/UNIT)
   ABT 2500 MTS OF WIRE IN COIL (MAX 5MT/UNIT)
   ABT 4300 MTS H-BEAM IN LOOSE ( MAX 5MT/UNIT), LENGTH : 12M

2. LOADING PORT : 1SBP POHANG, S.KOREA
   DISCHARGING PORT : 1 SBP YANGOON , MYANMAR

3. FREIGHT USD : 33 PMT FILO BSS 1/1



ANY BALANCE FREIGHT PAYABLE TO:

BANK: SHENZHEN DEVELOPMENT BANK CO., LTD., SHANGHAI
SWIFT:  SZDBCNBS
BENEFICIARY:  OMNI MARINE SERVICE LIMITED
ACCOUNT NUMBER:  OSA11007753556401

5. ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED



                              OWNERS

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SL SHIPPING PTE LTD,

                              Plaintiff,           09 CV

-v-                                       **ATTORNEY'S DECLARATION
THAT DEFENDANTS
CANNOT BE FOUND
WITHIN THE DISTRICT**

SILVERSHIPS LTD and
OMNI MARINE SERVICE LIMITED,

                             Defendants.
-----------------------------------------------------------------x

      This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

SL SHIPPING PTE LTD, in order to secure the issuance of a Summons and Process of Maritime

Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

      Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

      I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

      I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendants, SILVERSHIPS LTD and OMNI MARINE

SERVICE LIMITED pursuant to Rule B of the Supplemental Rules for Certain Admiralty and

Maritime Claims of the Federal Rules of Civil Procedure.

      I have personally inquired or have directed inquiries into the presence of the defendants

in this District.

I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of September 3, 2009, the defendants are not incorporated pursuant to the laws of New York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendants can be located within this District. The Verizon Telephone Company has advised me that the defendants do not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendants within this District.

I have engaged in a Google search as to whether the defendants can be located within this District. The Google search results did not provide any information that defendants are found in this District.

I am unaware of any general or managing agent(s) within this District for the defendants.

In that I have been able to determine that the defendants have not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendants can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendants do not have sufficient contacts or business activities within this District and do not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

.

It is my belief, based upon my own investigation that the defendants cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: Oyster Bay, New York
       September 3, 2009

                                    CHALOS & CO, P.C.
                                    Attorneys for Plaintiff
                                    SL SHIPPING PTE LTD

                        By:    _____
                                    George M. Chalos (GC-8693)
                                    123 South Street
                                    Oyster Bay, New York 11771
                                    Tel: (516) 714-4300
                                    Fax: (516) 750-9051
                                    Email: gmc@chaloslaw.com

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
SL SHIPPING PTE LTD,

                             Plaintiff,                    09 CV

  -v-

                                                      **VERIFICATION OF**
                                                      **COMPLAINT**

SILVERSHIPS LTD and
OMNI MARINE SERVICE LIMITED,
                              Defendants.
-----------------------------------------------------------------------x

         Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

        1.       I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff,

SL SHIPPING PTE LTD, herein;

        2.       I have read the foregoing Verified Complaint and know the contents thereof; and

        3.       I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and

attorneys.

        4.       The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

        I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oyster Bay, New York
       September 3, 2009

                    CHALOS & CO, P.C.
                    Attorneys for Plaintiff
                    SL SHIPPING PTE LTD

By: _____
                    George M. Chalos (GC-8693)
                    123 South Street
                    Oyster Bay, New York 11771
                    Tel: (516) 714-4300
                    Fax: (516) 750-9051
                    Email: gmc@chaloslaw.com